## G. W. BARKSDALE v. SAM KEISLING et al.

Middle Section.   May 1, 1931.

Petition for certiorari denied by Supreme Court, July 23, 1932.

W. Grady Sidwell, of Celina, and C. J. Cullom, of Livingston, for appellant, Barksdale.

L. A. Webb, of Celina, and P. J. Anderson, of Gainesboro, for appellees, Keisling et al.

CROWNOVER, J.   The original bill in this cause was filed to remove clouds from title to fifty acres of land described in the bill and to recover damages for timber cut and recover from said land.

The defendants answered and alleged that they derived title through a deed of the County Court Clerk of Clay County in a proceeding to sell the lands of John Barksdale, deceased, for partition; that complainant was one of the heirs of said John Barksdale and

one of the parties to said partition proceedings in the case of C. H. Richardson et al. v. G. W. Barksdale et al.; and as one of the heirs of John Barksdale impliedly warranted the title to said lands described in the Clerk's deed, and that having since purchased an outstanding title it inured to the benefit of the purchasers at the partition sale; and they therefore pleaded estoppel against said G. W. Barksdale.

The case was tried by the Chancellor sitting as a jury, on depositions, the record and oral testimony. The bill of exceptions shows that some of the testimony was taken in narrative form and was evidently introduced in open court. The Chancellor found that complainant's predecessor in title, Bates Neely, had established his title by adverse possession to the land in controversy; that Neely had conveyed same by warranty deed to J. F. Staggs, who had conveyed to G. W. Barksdale, the complainant, and that Barksdale, being one of the heirs of his father, John Barksdale, and one of the parties to the partition proceedings, had impliedly warranted the title to the land in dispute that had been purchased by one John Robbins at the partition sale and who had conveyed the same to defendant Keisling, therefore the title that he acquired from Neely through Staggs inured to the benefit of the purchaser at the partition sale and his vendee and assigns, and therefore the bill was dismissed.

Complainant's motion for a new trial having been overruled, he has appealed to this Court and has assigned several errors, which are, in substance, that the court erred in dismissing his bill, because there was no evidence to support the decree, and in holding that complainant's after acquired title inured to the benefit of the defendants.

John Barksdale owned a tract of land in Clay County, the boundaries of which included the fifty acres in controversy. At the death of John Barksdale said land was sold in the County Court of Clay County, on November 15, 1890, in the case of C. H. Richardson et al., v. G. W. Barksdale et al., for partition among the heirs, one of whom was complainant, G. W. Barksdale. This tract of land was sold to John Robbins and the Clerk of the County Court executed to him a deed, on March 12, 1894. John Robbins conveyed the same to Sam Keisling, one of the defendants in this cause, who has since sold the same to his codefendants, H. T. Peterman and others. G. W. Barksdale was a party to the County Court partition proceedings and received and receipted for his share of the proceeds of the sale.

Complainant insisted that he and S. S. Hull owned the Neely 300 acre tract on the west, which included the 50 acres in controversy.

It appears that this fifty acres in controversy was a part of a 60,000 acre tract granted by the State of North Carolina to Stokley Donaldson on March 7, 1796; and that in some manner the title to 1,000 acres of this tract, which covers the land in controversy, was vested in Sampson Williams, from whom both the complainant and defendants attempted to deraign title. Sampson Williams conveyed the 1,000 acres to Moses Fisk on July 8, 1819, and on January 17, 1870, G. W. Christian and wife, Celina Christian, conveyed 100 acres of this tract to Eli Pentecost. The complainant testifies that Celina Christian was a daughter of Moses Fisk and inherited the land from her father. On August 29, 1887, Elizabeth Earls and her heirs conveyed said 100 acre tract to William Williams. Elizabeth Earls was the widow of Eli B. Pentecost. On February 9, 1888, William Williams conveyed said 100 acre tract to Bates Neely and his deed was recorded on January 9, 1891. Bates Neely lived on said tract until he conveyed it to J. F. Staggs on May 24, 1904. The deed gives the same description as the William Williams deed but states that it contains 300 acres. On October 9, 1909, Staggs conveyed the tract to S. S. Hull and G. W. Barksdale, and on June 12, 1928, Hull conveyed his one-half undivided interest in the 50 acres in controversy to G. W. Barksdale, who filed this bill. Complainant Barksdale testifies that all of the foregoing deeds covered the 50 acres in controversy, but as will be observed by an examination of said deeds there are breaks in the chain of title.

The Chancellor held that Neely had perfected title to the land in controversy by adverse possession. The proof on this proposition is rather meagre but we think it is sufficient to support the Chancellor's holding. Neely testifies, and it is not disputed, that he moved into a house on this property within two or three weeks after he bought it in 1888, and lived on it for sixteen or seventeen years. He says there was a house and cleared field of seven or eight acres on Indian Creek, which he moved into, and that he kept up the fence and cultivated the land all the while he owned it, and claimed only the land that was deeded to him and to the lines shown him by William Williams just before he bought it. While he states that he never saw the lands surveyed out and could not testify as to whether the line was straight, he says that William Williams pointed out the lines and that he showed him the long line on the boundaries between him and John Barksdale, and he testifies about the sugar tree corner on the top of the ridge, the oak claimed as a line tree, and says that his fence was near that oak. He also testifies about the beech which was the corner at the north end of the long line running from the narrows on the Livingston highway to the beech tree corner. Applying this testimony to the C. V. Fitzgerald, County Surveyor, Map filed as Exhibit ''A'' to the testimony of G. W. Barksdale, it will be

seen that the possessions were on the land in controversy. Neely was holding under a warranty deed which purported to convey to him the fee in this land, which deed was a recorded assurance of title. His possession was open, notorious, visible and continuous, and he claimed the land to the boundary lines shown him by Williams. And the testimony shows that neither John Barksdale nor Robbins, claimed title to the property. Hence we think that the proof sufficiently shows that Neely held adverse possession for sufficient length of time to perfect his title.

While on the other hand, the recorded title papers show that the defendants do not have the legal title to the land in controversy, in that, taking it for granted that Sampson Williams' 1000 acre tract covered the 50 acres in controversy, as testified to by G. W. Barksdale, Sampson Williams conveyed this 100 acres to Moses Fisk on July 8, 1819, which deed was recorded on November 27, 1826. Hence Sampson Williams had no title to said property after that date, but on June 27, 1837, Sampson Williams conveyed to John Barksdale 430 acres which also covers the land in controversy, according to Fitzgerald's map.

Now, having traced the legal title to G. W. Barksdale, the determinative proposition is, whether the title thus acquired by Barksdale inured to the benefit of the defendants. The Chancellor held that it did.

After an examination of the authorities we are of the opinion that the Chancellor was not in error and that the complainant's title inured to the benefit of the defendants.

Originally at common law there was an implied warranty in favor of coparceners in partition cases, but if one of the coparceners alienated his interest and thus severed the connection between himself and the other coparceners, the condition and warranty were lost. 1 Coke upon Littleton, 174a (Thomas Ed., 829). The right of partition in kind applied only to estates in coparcenary, but this right was extended to estates held by joint tenancy and tenants in common by the statutes of 31 Henry VIII, c. 1, and 32 Henry VIII, c. 32, and as result of these statutes the courts extended the right of implied warranty to partition suits of such estates, Rawle on Covenants, 2 Ed., 465-9, which we inherited from the common law. Sawyers v. Cator, 8 Humphreys, 255.

The right of sale for partition was not recognized at common law. In Tennessee such right is conferred by statutes passed in 1827 and 1829, as is set out in Shannon's Code, sec. 5042; hence we do not have to observe the nice metaphysical constructions of the common law as applied to partition in working out the rights of the parties under these statutes authorizing a sale for partition.

After the passage of these statutes, in sales for partition, when a buyer obtained a defective title or one with encumbrances, he had a right to rescind the sale at any time before conveyance was executed and recover the purchase money paid. Deaderick v. Smith, 6 Humph., 138, 147; Read v. Fite, 8 Humph., 328; Foster v. Bradford, 1 Tenn. Chy., 402.

"A sale by the master in a case of this kind is but a mode of sale by the parties themselves. It is not merely a sale by the law, in invito, of such interest as the party has or may have, in which the rule is, caveat emptor; but professes to be a sale of a particular estate, stated in the pleadings to be vested in the parties, and to be disposed of for the purpose of partition only. Therefore, if there be no such title, the purchaser has the same equity against being compelled to go on with his purchase as if the contract had been made without the intervention of the court; for, in truth, the title has never been judicially passed on between persons contesting it. Hence, if a purchaser pays his money on a master's sale and discovers a defect in the title, at any time before a conveyance executed, he may recover it back: Sugden on Vendors, 345; Johnson v. Johnson, 3 Bos. & Pul., 162." Smith v. Brittain, 3 Iredell's Equity, 347, 42 Am. Dec., 175.

The purchaser who obtained a defective title might rescind and recover the purchase money paid, but he had no implied covenants of warranty until the Code of 1858, when a section was placed in the Code providing for implied covenants as follows:

"Covenants implied, when.—And, in such cases, where the sale is made at the voluntary instance of parties, the decree or deed of the clerk shall imply a covenant of seizin and warranty of title by the parties whose interest is sold, their heirs and representatives, unless otherwise provided in the face of the decree." Shannon's Code, sec. 5917.

This section applies to sales for partition, and the parties whose interests are sold, their heirs and representatives, are bound on the implied covenants the same as if they were written into the face of the decree or the deed. 13 C. J., 560; Moak v. Casualty Co., 4 Tenn. App., 292.

"As a rule, the Chancery Court in no case undertakes to sell more than the title of the parties to the suit; and after confirmation the rule of caveat emptor applies, except in case of sales for partition." Gibson's Suits in Chancery, sec. 641, note 7.

The implied warranties under this statute are not lost by alienation as in partition in kind, for the obvious reason that the rights of the parties do not have to be worked out under the fine distinctions of the common law applicable to partition in kind.

It results that G. W. Barksdale is liable on the implied warranties today, as he did not plead the statute of limitations, and having purchased an outstanding title it inures to the purchaser at the partition sale and his sub-vendees, who hold under deeds with covenants of general warranty.

"If a grantor having no title, a defective title, or an estate less than that which he assumes to grant, conveys with warranty or covenants of like import, and subsequently acquires the title or estate which he purported to convey, or perfects his title, such after-acquired or perfected title will inure to the grantee or to his benefit, by way of estoppel." 21 C. J., 1074, sec. 39; Ferguson v. Prince, 136 Tenn., 543, 190 S. W., 548; 5 Michie's Tenn. Ency. Digest, 267 and cases cited.

The contention that the deeds to John Barksdale, John Robbins and Sam Keisling did not cover the land in controversy, is not well made, as we have hereinabove held that they do cover that land.

The assignment that the defendant, Sam Keisling, is estopped to set up title to the land in controversy for the reason that he and his predecessors in title did not claim the land for several years, is not well made for the reason that it is not shown that the complainant was in any way injured by any acts of the defendant. It has been held that one does not lose a legal title by abandonment or passive acquiescence except by some estoppel or adverse possession. Southern Coal & Iron Co. v. Schwoon, 145 Tenn., 191, 223-5, 239 S. W., 398.

There is nothing in the assignment that the court erred in overruling complainant's motion in arrest of judgment based upon the same grounds as set out in the motion for a new trial, for the reason that a motion in arrest of judgment must be based on grounds of error appearing on the fact of the record. Elbinger Shoe Co. v. Thomas, 1 Tenn. App., 161, 167.

All the assignments of errors having been overruled, the decree of the Chancellor dismissing the bill must be affirmed. The cost of the cause including the cost of the appeal is adjudged against appellant and the sureties on his appeal bond.

DeWitt, J., and Higgins, Sp. J., concur.